**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ADAMS CHIROPRACTIC CENTER P.C., *et al.*, <br><br><br> Defendants. | Civil Action No: 19-20633(SDW)(ESK) <br><br> **OPINION** <br><br> June 29, 2023 |

**WIGENTON**, District Judge.

Before this Court are Defendants Adams Chiropractic Center, P.C. ("Adams Chiro"), Andrew Andonov, D.C., Rodel C. Baguioro, P.T., Eldebrando O. Estomo, P.T., Peter Angelo, L.A.C., Nighat Jawed, Jennifer Rodriguez, Advanced Balance and Wellness, LLC ("Advanced Balance"), Nyree Padilla, M.D., Individual and Business Counseling, Inc. ("IBC"), Frank L. Weiss, Ph.D., and James R. Morales, M.D.'s (collectively, "Defendants") Motion to Strike Expert Report and Exclude Testimony, (D.E. 138), and Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co.'s (collectively, "GEICO" or "Plaintiffs") Motion to Exclude Certain Opinions of Defendants' Experts, (D.E. 140). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendants' Motion is **DENIED**, and Plaintiffs' Motion is **GRANTED**.

### I. FACTUAL AND PROCEDURAL HISTORY

As the parties are familiar with the facts and procedural history of this dispute, this Court addresses only those facts necessary for the resolution of the instant motions. Under New Jersey's "comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries," commonly known as the no-fault system, insurers "provide Personal Injury Protection benefits ("PIP Benefits") to insureds." (D.E. 54 ¶ 13 (citing N.J. STAT. ANN. §§ 39:6B–1 to 3 and N.J. STAT. ANN. §§ 39:6A–1 et seq.) (collectively referred to as "no-fault law").) Plaintiffs allege that between 2013 and 2020, Defendants "submitted, thousands of fraudulent no-fault insurance charges through [Adams Chiro], [Advanced Balance], and [IBC] (collectively the "Entity Defendants") for purported initial examinations, follow-up examinations, chiropractic services, physical therapy services, acupuncture treatments, biofeedback training, pain management injections, and psychological services (collectively the "Fraudulent Services")." (*Id.* ¶ 1.) The alleged Fraudulent Services resulted in a loss to Plaintiffs of "more than $2,700,000.00." (*Id.*)

Specifically, Plaintiffs assert that various Defendants participated in and/or were responsible for "illegal referral schemes," (*id.* ¶¶ 21–50); "fraudulent treatment and billing protocol[s]," (*id.* ¶¶ 51–133); "fraudulent charges for chiropractic and physical therapy services," (*id.* ¶¶ 134–51); "fraudulent billing for biofeedback training," (*id.* ¶¶ 152–64); "fraudulent charges for acupuncture," (*id.* ¶¶ 165–75); "fraudulent charges for initial examinations," (*id.* ¶¶ 176–78); "misrepresentations regarding the severity of the insureds' presenting problems," (*id.* ¶¶ 179–201); "fraudulent charges for follow-up examinations," (*id.* ¶¶ 202–24); and "fraudulent charges for psychological evaluations," (*id.* ¶¶ 225–35). Plaintiffs further contend that Defendants billed

Plaintiffs for "the Fraudulent Services for which they were not entitled to receive payment," and caused Plaintiffs to justifiably rely on Defendants' representations. (*Id.* ¶¶ 236–43.)

On November 22, 2019, Plaintiffs filed a Complaint against Defendants. (*See* D.E. 1.) On January 3, 2020 and January 8, 2020, several Defendants moved to dismiss the Complaint. (*See* D.E. 8; D.E. 10.) On February 24, 2020, this Court denied Defendants' Motions to Dismiss. (*See* D.E. 20; D.E. 21.)

On June 3, 2020, Plaintiffs submitted an Amended Complaint alleging nineteen counts, including: violations of the New Jersey Insurance Fraud Prevention Act ("NJIFPA"), N.J. STAT. ANN. §§ 17:33A-1 *et seq.* (Counts 2–4); violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Counts 5–6, 10–11, 15–16); common law fraud (Counts 7, 12, 17); aiding and abetting fraud (Counts 8, 13, 18); and unjust enrichment (Counts 9, 14, 19). (D.E. 54 ¶¶ 248–369.) In addition to money damages, Plaintiffs seek a declaratory judgment pursuant to 18 U.S.C. §§ 2201, 2202, (Count One), that the Entity Defendants were "not in compliance with all significant laws and regulations governing healthcare practice because they unlawfully billed inflated amounts for medically unnecessary services, and in some cases illusory services, and provided and received illegal compensation in exchange for patient referrals" during the relevant period. (*Id.* ¶¶ 244–47.)

On February 25, 2020, Plaintiffs moved to stay any existing PIP arbitrations brought by or on behalf of Adams Chiro against Plaintiffs, and to enjoin the future filing of such arbitrations while the instant matter was pending, which this Court denied on June 29, 2020. (*See* D.E. 22; D.E. 60; D.E. 61.)

On June 19, 2020, Defendants moved to quash subpoenas, issue a protective order, and bifurcate discovery, which this Court denied on July 27, 2020. (*See* D.E. 77.)

The parties proceeded to discovery and later participated in mediation, the latter of which was ultimately unsuccessful. (*See* D.E. 137.) The parties filed the instant Motions on November 11, 2022 and November 23, 2022, and thereafter, with approved deadline extensions, completed timely briefing. (*See* D.E. 138–39; D.E. 140–41; D.E. 146–50.)

## II. <u>LEGAL STANDARD</u>

Where a party challenges the reliability of an expert opinion, the reviewing court must ascertain whether the opinion is admissible as to those aspects under Federal Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187–88 (3d Cir. 2015). FRE 702 provides the following parameters for admissible expert testimony:

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In deciding whether to admit expert testimony, the trial court is a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999) (applying *Daubert* standard to all expert testimony). The court must consider whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, *i.e.*, it must "fit" the facts of the case. *See United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008)). The proponent of the expert testimony must prove these requirements by a preponderance

4

of the evidence. *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)).

To be qualified as an expert, FRE 702 requires a witness to have "'specialized knowledge' regarding the area of testimony. The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials.'" *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990)). The Third Circuit has "stress[ed] that ordinarily an otherwise qualified witness is not disqualified merely because of a lack of academic training." *Id.* at 626. Furthermore, the specialized knowledge requirement is to be interpreted liberally and, consequently, "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig. (Paoli II)*, 35 F.3d 717, 742 n.8 (3d Cir. 1994) (citing *In re Paoli R.R. Yard PCB Litig. (Paoli I)*, 916 F.2d 829, 855 (3d Cir. 1990), *cert. denied*, 499 U.S. 961 (1991)).

To decide whether proposed expert testimony is reliable, a court may examine:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II*, 35 F.3d 717, 742 n.8 (3d Cir. 1994) (citing *Daubert*, 509 U.S. at 591; *United States v. Downing*, 753 F.2d 1224, 1238–39 (3d Cir. 1985)). Proponents of expert testimony, however, need not "prove their case twice—they do not have to demonstrate . . . by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (quoting *Paoli II*, 35 F.3d at 750). Importantly, courts "'interpret[] this

5

requirement liberally' . . . .'" *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003 (quoting *Paoli II*, 35 F.3d at 741).

To satisfy the fit requirement, the expert analysis must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *Downing*, 753 F.2d at 1242). Whether the analysis fits with the case "depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Paoli II*, 35 F.3d at 743 (quoting *Downing*, 753 F.2d at 1237).

### III. DISCUSSION

#### A. Defendants' Motion

Defendants seek to strike a report and testimony by Plaintiffs' retained expert Matthew Shatzer, D.O. ("Dr. Shatzer") on the bases that (1) Dr. Shatzer did not write the report and instead signed a report prepared by Plaintiffs' attorneys, and the report contains copied and pasted sections from reports that were used in other matters with which Plaintiffs' attorneys have been involved, (D.E. 138-1 at 14–22); (2) Dr. Shatzer lacks the requisite specialized expertise needed to be helpful to the jury, (*id.* at 22–39); and (3) the report contains legal conclusions and "states of mind," (*id.* at 39–43).[1] After reviewing the parties' submissions, this Court rejects Defendants' arguments in turn.

#### 1. Authorship of the Report

Defendants contend that because Dr. Shatzer "admitted he did not write the report," the report contains information that appeared in expert reports submitted in other matters on which Plaintiffs' counsel worked, and Plaintiffs' counsel in the present matter wrote a book about no-

---

[1] Citations of page numbers from the parties' briefs and related materials refer to the D.E. filing page numbers, not to each document's original page numbers.

6

fault insurance anti-fraud litigation, the report should be excluded. (*Id.* at 14–22.) Plaintiffs counter that because of a prior decision in this Court concerning a discovery dispute related to the authorship of Dr. Shatzer's report, Defendants' Motion should be denied based on the law of the case doctrine. (D.E. 147 at 13–22.) Plaintiffs further contend that Dr, Shatzer's opinion satisfies the *Daubert* standard, and Defendants' arguments concerning the authorship of the report serve only to challenge witness credibility, which is an issue for the jury. (*Id.* at 22–26.)

To begin with, the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). Of note, the doctrine "does not restrict a court's power but rather governs its exercise of discretion." *In re Phila.*,158 F.3d 711, 718 (3d Cir. 1998) (citing *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir.1997)).

Here, Defendants put forth similar arguments during a hearing in which the Honorable Edward S. Kiel, U.S.M.J., resolved a discovery dispute between the parties over Defendants' demands for documentation pertaining to the authorship of Dr. Shatzer's report. (D.E. 119 at 1–26.) Judge Kiel determined that the issue of whether Dr. Shatzer had "sufficient input into the preparation of his expert report and whether the level of drafting by [P]laintiffs' counsel was improper" was not appropriately for him to decide; the jury would need to make that determination at trial. (*Id.*) Judge Kiel then addressed each discovery dispute and ordered production of additional information by which Defendants could examine the authorship and efficacy of Dr. Shatzer's report. (*Id.* at 9–16.) Judge Kiel's determination of whether additional discovery was warranted, however, did not directly address Defendants' contentions; therefore, the law of the case is not at issue in this instance.

Turning to Defendants' challenge concerning authorship of the report, Dr. Shatzer's admission that he discussed his findings with Plaintiffs' attorneys, and that someone at the attorneys' office "typed the report, and then . . . sent it" to him "to review, make any changes that [he] felt would be necessary," make sure nothing was missed, and sign it is not sufficient for this Court to strike the report and testimony. (D.E. 138-3 at 76:18–77:3 ("Shatzer Dep.").) Additionally, the existence of similarities between the report for this matter and previous reports does not automatically indicate that the report was prepared improperly, or that the attorneys and Dr. Shatzer committed misconduct when preparing the report.

First, "[a] plain reading of Rule 26(a)(2)(B) does not require that an expert personally draft his report, but instead provides that the expert report must be 'prepared and signed by the witness.'" *Pritchard v. Dow Agro Sciences*, 263 F.R.D. 277, 282–83 (W.D. Pa. 2009) (citing FED. R. CIV. P. 26(a)(2)). Furthermore,

> the 1993 Advisory Committee Notes permit the assistance of counsel in preparing an expert's report, explaining that:
>
> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

*Id.* (quoting FED. R. CIV. P. 26, 1993 Advisory Committee Notes).

Here, Dr. Shatzer testified that while it is true that someone at counsel's office typed the report, he reviewed all of the relevant claims filed and discussed his findings with Plaintiffs' attorneys. (Shatzer Depo at 76:18–77:3). This Court finds that, in accordance with Rule 26, in this particular instance the assistance counsel provided in typing the report is not improper. *See, e.g., Crowley v. Chait*, 322 F. Supp. 2d 530, 543–44 (D.N.J. 2004) (finding that an attorney drafting

8

a report based on an interview with an expert was proper given that the expert provided substantial input into the contents of the report and signed the report).

Second, while "there is overlap of general background language in the reports submitted by Dr. Shatzer in this case and in the *Right Spinal* action,[2] and with the report submitted by Dr. Dillard in the *Cereceda* action,"[3] (D.E. 147 at 18), such overlap does not necessarily indicate misconduct regarding preparation of the report.  The *Right Spinal* and *Cereceda* reports may be similar to the submission in this action and may express similar opinions.  However, employing repeated language to describe medical procedures could feasibly occur between expert reports because there are only so many ways to describe highly technical procedures and provide detailed descriptions of medical information.  It stands to reason that an expert employing language that assisted a jury in another case to understand the concepts at issue in the present case is not automatically disqualifying—or even ill-advised, for that matter.  Moreover, Defendants will have an opportunity to cross-examine Dr. Shatzer regarding his review of the relevant documents and preparation of the report, thereby allowing the jury to assess his credibility.

Finally, Defendants' argument concerning the authorship of a book about no-fault insurance anti-fraud litigation, (D.E. 138-1 at 21–22), does not support Defendants' concerns about the authorship of the report, and is largely irrelevant to this discussion.

### 2. Dr. Shatzer's Specialized Expertise

Defendants challenge Dr. Shatzer's specialized expertise and contend that he has "no expertise in any of the specialties," and, in particular, his qualifications are not appropriately specialized, "there is no methodology or technique" to his report because it was written by

---

[2] *Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*, No. 20-802 (M.D. Florida).
[3] *Gov't Emps. Ins. Co. et al v. Cereceda, et al.*, No. 19-22206 (S.D. Florida).

Plaintiffs' counsel "to parrot their complaint and 'theories,'" and there is no fit to the case because counsel purportedly wrote the report and Dr. Shatzer merely signed his name to it. (D.E. 138-1 at 22–39.) Plaintiffs retort that Dr. Shatzer's vast credentials and significant experience as a physician who has treated many patients with soft-tissue injuries reflect that he is qualified, the methodology and conclusions in his report are reliable, and his opinion and testimony will assist the jury in understanding the evidence. (*Id.* at 22–25.) To determine the admissibility of Dr. Shatzer's report and testimony, this Court examines whether Dr. Shatzer is qualified, whether his opinion is reliable, and whether his opinion is a fit to the case and will be helpful to the trier of fact. *See Schiff*, 602 F.3d at 172 (quoting *Pineda*, 520 F.3d at 243).

### a. Qualifications

Dr. Shatzer is qualified to opine on matters concerning Defendants' treatment and billing practices. While FRE 702 requires an expert witness to have "'specialized knowledge' regarding the area of testimony," *Waldorf*, 142 F.3d at 625 (quoting *Am. Tech. Res.*, 893 F.2d at 656), the requirement is to be interpreted liberally, and "a broad range of knowledge, skills, and training qualify an expert as such," *Paoli II*, 35 F.3d at 742 n.8 (citing *Paoli I*, 916 F.2d at 855). Dr. Shatzer's specialty is physical medicine and rehabilitation. (D.E. 138-4 at 33.) The issues on which he will opine are primarily related to treatment of and billing pertaining to soft-tissue injuries from automobile accidents and, more specifically, concern blood pressure readings, examination reports, billing records, patient examinations, treatment recommendations, treatment protocols, physical therapy, biofeedback treatments, and standards of care—all of which surely fall under the expertise of an experienced Chief of Physical Medicine and Rehabilitation. (D.E. 138-4 at 23.)

10

Dr. Shatzer has practiced as a physical medicine and rehabilitation physician for over twenty years and has treated between 500 to 700 patients with soft-tissue injuries from motor vehicle accidents. (D.E. 148-2 at 21:10 to 22:3.) He has written multiple published articles and book chapters concerning related issues in rehabilitation medicine. (D.E. 138-4 at 34–35.) He has also testified as a qualified expert in multiple court cases. (*Id.* at 22.) While Dr. Shatzer does not practice as a chiropractor, his relative experience has clearly provided him with the knowledge, skills, and training to opine about the treatment and billing practices at issue in this matter.

### b. Reliability

Dr. Shatzer's proposed expert testimony is reliable. Defendants contend that this Court cannot assess Dr. Shatzer's methodology or technique because he did not write the report he submitted. (D.E. 138-1 at 39.) That assertion is not supported by Dr. Shatzer's testimony, in which he confirmed that he reviewed relevant parts of all 356 claim files over a ten- to fifteen-hour period; he discussed his findings with Plaintiffs' attorneys; Plaintiffs' attorneys assisted with preparing the report; and Dr. Shatzer then reviewed the report, ensured its accuracy, and signed it. (Shatzer Dep. at 70:14–71:17, 76:11–77:3.) As discussed *supra*, counsel assisting Dr. Shatzer with typing and preparing the report does not automatically deem the report unreliable.

A review of the report reveals that the methodology is sufficiently reliable. The Rule 702 inquiry into reliability is "'a flexible one' and . . . the individual factors are neither exclusive nor dispositive." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 595 (3d Cir. 2003) (quoting *Daubert*, 509 U.S. at 594–95). Here, Dr. Shatzer reviewed the appropriate treatment and billing records for all 356 insured patients, as well as other related materials. (D.E. 138-4 at 1–22, 24–37.) Dr. Shatzer based his findings on his review of Defendants' examination reports, relevant police reports, patient records, treatment recommendation records, and billing

records.  (D.E. 138-4 at 2; Shatzer Dep. at 70:14–71:17, 76:11–77:3.)  Dr. Shatzer cited standards, methods, and practices that are recognized by standard-setting organizations, and he also applied the facts contained in the records he reviewed to opine about various aspects of Defendants' treatment and billing practices.  (D.E. 138-4 at 3–23.)

Specifically, Dr. Shatzer included detailed analyses concerning Defendants' examination findings compared to related police reports; blood pressure readings compared to average readings cited by the Centers for Disease Control; pain levels reported to Defendants compared to those reported in clinical settings; pain levels reported by multiple victims of the same car accident compared to the typical variation of pain levels in such instances; billing irregularities pertaining to initial and follow-up examination records compared to standard industry billing practices; tailored, individualized treatment plans compared to "cookie-cutter" approach treatment plans; medically necessary treatment compared to medically unnecessary treatment; proper qualifications for persons trained in biofeedback services and the medical necessity of such treatment; and the necessity of MRI referrals.  (*Id.*)  Dr. Shatzer's report relied on the facts deduced from the documentation he reviewed, and he then appropriately applied the facts to his conclusions.  When considering the evidence provided by Plaintiffs, it is important to note that this Court does not necessarily deem Dr. Shatzer's assessments correct, but does find that Plaintiffs have sufficiently demonstrated the reliability of Dr. Shatzer's methodology by a preponderance of the evidence.  *See Oddi*, 234 F.3d at 145 (quoting *Paoli II*, 35 F.3d at 750).

      **c.  Fit**

The expert analysis Dr. Shatzer seeks to provide is "sufficiently tied to the facts of the case" and "will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591 (quoting *Downing*, 753 F.2d at 1242).  Defendants argue that "[n]othing contained [in Dr. Shatzer's report]

12

is helpful to a juror." Plaintiffs contend that "Dr. Shatzer's testimony clearly will help the factfinder in this case" and, because of his relevant experience, his opinions "will be of assistance to the trier of fact." (D.E. 147 at 24–26.)

Whether an analysis fits with a case "depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Paoli II*, 35 F.3d at 743 (quoting *Downing*, 753 F.2d at 1237). As already discussed at length *supra*, Dr. Shatzer cogently applied the facts from the records he reviewed to his conclusions about the treatment and billing practices at issue, which is exactly what this case is about. Dr. Shatzer's report and testimony fits with the issues presented in this matter and is likely to assist the jury in deciding the disputed factual issues. Consequently, because Dr. Shatzer's report and proposed testimony "rests on a reliable foundation and is relevant to the task at hand," it satisfies the *Daubert* standard. *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co.*, 526 U.S. at 147–48.

### 3. Legal Conclusions and States of Mind in Dr. Shatzer's Report

Defendants contend that Dr. Shatzer's report contains "legal conclusions and states of mind" because Dr. Shatzer's employment of the term "legitimate" in the report is a legal conclusion that improperly instructs the jury on the ultimate issue. (D.E. 138-1 at 39–43.) Plaintiffs counter that the out-of-circuit cases Defendants cite are broadly inapposite and do not support Defendants' contention. Further, Plaintiffs point out that Defendants will have an opportunity to rigorously cross-examine Dr. Shatzer on his opinions and report findings.

FRE 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." FED. R. EV. 704(a). The Advisory Committee's notes clarify that "[t]he basic approach to opinions . . . in these rules is to admit them when helpful to the trier of fact. In order

13

to render this approach fully effective and to allay any doubt on the subject, the so-called 'ultimate issue' rule is specifically abolished by the instant rule." *Id.*, 1984 Advisory Committee Notes.

Here, framing the word "legitimate" as a legal conclusion and asserting that use of that term improperly instructs the jury is not compatible with Rule 704(a) and the Advisory Committee's notes. Use of that terminology does not equate to an expert witness using clearly inadmissible conclusions, such as accusations concerning a defendant committing fraud, violating a statute, failing to meet legal requirements, and the like. (*Compare* D.E. 138-1 at 39–43 (discussing cases in which various courts held testimony inadmissible for presenting legal conclusions), *with* D.E. 147 at 24–25 (contextualizing each case put forth by Defendants)). Dr. Shatzer's report does not improperly instruct the jury on what result to reach simply by employing the word "legitimate." The motion to exclude Dr. Shatzer's report and testimony will therefore be denied.[4]

**B. Plaintiffs' Motion**

Plaintiffs seek to exclude certain opinions proffered by Defendants' retained experts Daniel Murphy, D.C. ("Dr. Murphy"), Edward Julie, M.D. ("Dr. Julie"), and Donald Franklin, Ph.D. ("Dr. Franklin") on various bases. (D.E. 140). Defendants challenge the validity of Plaintiffs' Motion and claim that "the whole of Plaintiffs' [M]otion reads as simply another opportunity to reiterate its 'theory' based upon false conclusions and erroneous facts," and assert that "the absurdity of a motion to exclude expert testimony based upon self-serving conclusions written by Plaintiffs' own counsel in their own 'expert report' cannot escape this honorable [C]ourt." (D.E. 146 at 4–5.) This Court addresses each specific request to exclude.

---

[4] This decision is subject to review depending on trial testimony.

### 1. Dr. Murphy's Standard of Care Opinion and General Opinions

Plaintiffs move to exclude the following opinions proffered by Dr. Murphy: (a) "that the healthcare services purportedly performed by and through [Defendants] Adams Chiro 'meet the standard of care,'" (D.E. 140-1 at 5 (citing Kang Decl., Ex. 1, at p. 3); *see also* D.E. 141-1 at 4)); and (b)

> that, in general and without any application to the facts of this case: [(i)] the use of similar billing codes for similar injuries is 'standard,'" [(ii)] the referral of chiropractic patients to other specialists, including neurologists, orthopedists, and psychologists is 'standard,'" [(iii)] the referral of injured patients for advanced diagnostic imaging, including MRIs, is 'standard,'" [(iv)] it is 'common' for different patients with similar injuries to complain of similar symptoms," and [(v)] it is 'common' for different patients with similar injuries to have similar examination findings, including reduced ranges of motion."

(D.E. 140-1 at 5–6 (citing Kang Decl., Ex. 1, at p.3; *see also* D.E. 141-1 at 4.)

First, Plaintiffs argue that Dr. Murphy conceded in his deposition that "his conclusions regarding the 'standard of care' w[ere] not, in fact, based on any critical analysis . . . , but rather w[ere] solely based on his personal belief that all medical records are accurate, . . . ." (D.E. 140-1 at 10.) Second, Plaintiffs contend that Dr. Murphy's opinions are broad and do not address the specific details of this matter, and therefore should be excluded. (*Id.*) Defendants counter that Dr. Murphy's expertise is vast, disagreement with his opinion is not a valid basis for exclusion, and "[c]learly Dr. Murphy is able to give his opinion to all the objected[-]to matters based upon his experience and qualifications." (D.E. 146 at 11–17.) This Court addresses each tranche of Dr. Murphy's opinions in turn.

#### a. Analysis of Standard of Care Opinion

This Court first considers whether Dr. Murphy may opine that the services Defendants performed met the "standard of care." (D.E. 140-1 at 9 (citing Kang Decl., Ex. 1, at p. 3), 13–19;

15

*see also* D.E. 141-1 at 4).)  The first gatekeeping factor is whether Dr. Murphy is qualified, s*ee Schiff*, 602 F.3d at 172 (quoting *Pineda*, 520 F.3d at 243)), but Plaintiffs do not challenge Dr. Murphy's qualifications as an expert in chiropractic practice.  (D.E. 149 at 7).

The second factor is whether Dr. Murphy's testimony concerning the standard of care is reliable.  *See Schiff*, 602 F.3d at 172 (quoting *Pineda*, 520 F.3d at 243)).  Dr. Murphy opines that "Adams['] treatment for MVAs[5] meet[s] the standard of care."  During a deposition, Dr. Murphy testified about the creation of accurate examination records and reviewed specific examples of blood pressure readings that were recorded by Defendant Dr. Andonov, which bears upon the standard of care in Defendants' treatment of patients.  (D.E. 141-6 at 68:13–98:2 ("Murphy Dep.")).  Plaintiffs' counsel questioned Dr. Murphy about his methodology for ascertaining whether the examination records were valid or not.  (*Id.* at 98:3–100:25.)  Dr. Murphy testified that he based his opinion about the validity of the records on "[t]he fact that they exist" and asserted that he "look[s] at exam forms as being valid," that "there are records that seem to be pretty extensive," and he "just believe[s] them to be valid.  Because someone took the time to create them, [he] believe[s] them to be valid."  (*Id.* at 98:14–99:5.)  When Plaintiffs' counsel asked if he "just naturally assume[s] that all of [the records] are legitimate regardless of what implausible information might be contained within them," Dr. Murphy answered "yes."  (*Id.* at 100:19–25.)  This opinion testimony does not reflect methodology based on published standards of care or on Dr. Murphy's experience and technological or scientific knowledge.  This specific opinion does not reflect a detailed review of the records and facts as presented, but rather reflects a subjective belief that such records are inherently accurate based solely upon their creation.

---

[5] The report neglects to define the acronym "MVA."

This specific opinion does not derive from "a valid methodology," but rather is based on the *ipse dixit* of the expert." *Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000) (citing *Kumho Tire Co.*, 526 U.S. at 156–57). As a result, Defendants have not satisfactorily demonstrated the reliability of Dr. Murphy's methodology by a preponderance of the evidence. *See Oddi*, 234 F.3d at 145 (quoting *Paoli II*, 35 F.3d at 750).

Because this opinion does not satisfy the reliability factor of the gatekeeping analysis, examination of the fit factor is unnecessary. *See Schiff*, 602 F.3d at 172 (quoting *Pineda*, 520 F.3d at 243)). Consequently, this specific opinion will be excluded.[6]

### b. Analysis of General Opinions

This Court next considers whether Dr. Murphy may opine about standard use of billing codes, standard referral of patients to other specialists, and standard referral of patients for advanced imaging, and about the commonality of similar symptoms and examination findings for patients with similar injuries. (*See* D.E. 140-1 at 9–10 (citing Kang Decl., Ex. 1, at p.3), 19–20; *see also* D.E. 141-1 at 4.) Plaintiffs' challenge focuses on the third gatekeeping factor: the fit— and, in particular, the application of the opinions to the facts of the case. *See Paoli II*, 35 F.3d at 743 (noting that the fit depends on "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." (quoting *Downing*, 753 F.2d at 1237)).

Expert testimony must be "sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute." *Schiff*, 602 F.3d at 173 (citing *Daubert*, 509 U.S. at 591)). Here, Dr. Murphy's report does not note or point to the genesis of the facts related to these particular opinions. Moreover, the opinions are generalized conclusions that are not obviously

---

[6] This decision is subject to further expansion depending on trial testimony.

connected to any particular facts presented in the case, which renders the opinions unhelpful to the jury. Because Defendants have not put forth a preponderance of evidence showing that these opinions would assist the trier of fact, these particular opinions will be excluded.[7]

### 2. Dr. Julie's Opinion Concerning Irrationality of Conclusion About Fraudulent Intent

Plaintiffs move "to exclude the opinion offered by Dr. Julie that it would be 'irrational' to conclude that [Defendant] Dr. Andonov acted with a 'fraudulent intent' when he recorded identical blood pressure rates in hundreds of GEICO-insured patients' examination records." (D.E. 140-1 at 11 (citing Kang Decl., Ex. 2, at p. 3), 20–21; *see also* D.E. 141-2 at 4.) Plaintiffs assert that this specific opinion is "an uninformed legal opinion" and lacks a reliable foundation, thus it should be excluded. (D.E. 140-1 at 11.) Defendants retort that Plaintiffs mis-quoted Dr. Julie's report in their brief, and "it was appropriate for Dr. Julie to respond to" Plaintiffs' allegations "in the manner he did." (D.E. 146 at 22–26.)

To begin with, Dr. Julie's report does not actually employ the word "irrational," and rather states that "there is no rational reason to conclude a fraudulent intent in recording higher BP measurements." (D.E. 141-2 at 4.) This Court presumes that Plaintiffs made a scrivener's error in transposing "no rational reason" into "irrational." Of import, the meaning is not altered by the error. This analysis will be based upon the actual quoted information in Dr. Julie's report.

The Third Circuit has observed that "[w]hile Rule 704 allows experts to provide an opinion about the 'ultimate issue' in a case, it prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards." *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013). A court must "must ensure that an expert does not testify as to the governing law of

---

[7] This decision is subject to further expansion depending on trial testimony.

18

the case," because such testimony "would usurp the District Court's pivotal role in explaining the law to the jury." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (citing *First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981) (per curiam)).

Here, Dr. Julie's report contends that there is no rational reason to find that the Defendants acted with fraudulent intent, which is an improper legal conclusion as to the state of mind of Dr. Shatzer (no rational reason for his finding). This particular statement also improperly opines as the purported culpability of Defendants (did not act with fraudulent intent). Accordingly, this specific opinion will be excluded.[8]

### 3. Dr. Franklin's Opinions Concerning the Sufficiency of Evidence and the Legality of Referrals

Plaintiffs move to exclude the following opinions proffered by Dr. Franklin: (a) "that none of the materials reviewed by Dr. Franklin 'indicated any evidence of an illegal or secret referral agreement'"; (b) that "there is 'no evidence' that the IBC Defendants cross-referred GEICO patients, who were originally referred by [Defendants] Adams Chiro and Andonov to the IBC Defendants, back to Adams Chiro and Andonov"; (c) that "there is 'no evidence' of a 'secret referral agreement' between the IBC Defendants and Adams Chiro and Andonov"; (d) that "the 'facts in evidence' do not support the 'allegations' levied against Weiss in the Klesmer Report"; and (e) that "it is 'not illegal for a healthcare provider to receive referrals.'" (D.E. 140-1 at 11 (citing Kang. Decl., Ex. 3, at pp. 1, 4, 5), 21–22; *see also* D.E. 141-3 at 2–6.) Plaintiffs contend that these opinions are "uninformed and unreliable legal opinions," and consequently should be excluded. (D.E. 140-1 at 11.) Defendants argue that Dr. Franklin is merely responding to Dr. Shatzer's report, state that Dr. "Franklin is not making a legal conclusion," ask whether "Dr.

---

[8] This decision is subject to further expansion depending on trial testimony.

Franklin [is] not to be able to reply," contend that "[t]here is nothing wrong with Dr. Franklin's opinion," and ask "[h]ow else does Dr. Franklin address Plaintiffs blatantly claiming an untruth as fact?" (D.E. 146 at 26–30.)

Opinions (a) through (d), however, remark upon the existence of evidence, and whether the evidence supports allegations—determinations that a jury must make. *See Patrick*, 536 F. App'x at 258. Additionally, opinion (e) discusses the legality of receiving referrals—a legal determination that usurps the Court's role in explaining the law, and further may confuse the jury. *Berckeley Inv. Grp., Ltd.*, 455 F.3d at 217 (citing *First Nat'l State Bank*, 668 F.2d at 731). Therefore, these particular opinions will be excluded.[9]

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Strike Expert Report and Exclude Testimony, (D.E. 138), is **DENIED**. Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Experts, (D.E. 140), is **GRANTED**. An appropriate order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:       Clerk
cc:         Hon. Edward S. Kiel, U.S.M.J.
            Parties

---

[9] This decision is subject to further expansion depending on trial testimony.